of the United States v. Manson, and so Mr. Frisch, you've got five minutes. Let me just make sure everybody's got, you know what, can you hold on one second? Of course. I left my glasses back there. Okay. Thanks. I'm sorry about that. I need these. It's not like Bianca who just wears them to look smart. Your Honors, good morning from Mr. Manson, Andrew Frisch. Despite the long history of this case, I think I can make my strongest arguments with at least some precision. Even if it is substantively reasonable for the judge, for Judge Brown, to have imposed a sentence of 24 months on 0 to 6, Judge Brown himself seemed to understand that the abnormalities of this case, its unusual history, required adequate notice of his consideration of an above-guideline sentence. So why is that? Well, there's really two buckets of reasons. The first is that the government's change of position on Manson, with no new facts, ultimately concluding that he neither caused nor intended any loss, supports all of the arguments that were previously made, that I made on behalf of both defendants, to Judge Spatt. Now, I got what I wanted. I got a 0 to 6 range for Manson. The 0 to 6 mooted all of the arguments I made before Judge Spatt. But they became unmooted when Judge Brown rejected the party's conclusions on loss, on gain, on what was reasonably- Didn't they become unmooted with the plea agreement? I beg your pardon, Judge? I'm sorry. Didn't they actually become unmooted because of the plea agreement that allowed for much more time and a potentiality for that? No, because the plea agreement was based on the government's position that Mr. Manson intended or caused a loss of $96 million in which they ultimately made $140 million in advance of Callahan's sentencing to accommodate credits. And in the chronology that I've set forth in my bail application, they continue to say even thereafter that Mr. Manson's guideline range is 151 to whatever the top is of that range. But, like, then why doesn't the plea agreement say, I won't appeal unless it is five months more than the top of the guideline range? It seems to me by picking an absolute number, there's a notice that that could be the number. But Manson didn't pick the number. It was imposed on him. There's no mutual mistake- But the plea agreement, Mr. Frist, says if 60 months or less, regardless of what the guideline calculation is, you can't appeal. So your client was on notice if he got 60 months or anything less than 60 months, in this case two years, that he couldn't appeal. And got consideration for that. The government agreed he wasn't going to seek an upward departure. It wasn't going to make a recommendation regarding the range. So he was well aware of what he was doing. He was well aware of what the government's position was. But the government's position was predicated on an assumption that they now, that they have disavowed, not based on new facts. They had all the facts that they have now to tell Judge Brown that there's no loss and no gain. Judge Brown said I'm giving him two years because notwithstanding the fact that there was no actual loss, he lied repeatedly to auditors in transactions involving ten millions of dollars and believes that the fraud would have been discovered earlier if your client hadn't lied. So Judge Brown didn't elevate the guideline range. He understood it was zero to six. But he felt like the seriousness of your client's conduct warranted two years. And judges do that, right? Fair enough. But before he gets to that, what he was questioning, what Judge Brown expressly questioned, were all the things incorporated in the guidelines. That is, I mean, look, his sentence could have straddled both variance and departure. Could have been both. How can you incorporate the guidelines if someone lies repeatedly to the auditors in transactions involving tens of millions of dollars, but it just so happens that there's no loss because of the nature of the investment. And that gets away with no jail time. No. It was serious conduct. That's not the point at all. The point is that before Judge Brown reaches that point, could have sentenced him to zero, could have sentenced him to six, could have gone above it. But before he does that, there has to be an understanding of what the loss really is, is what the gain really is, what the reasonable foreseeability really is, whether Manson really overpaid in millions of dollars. But doesn't that defeat the point of the plea agreement, right? Like part of the plea agreement is for folks to say there is a range. We are trying to save government and taxpayers the time and resources and emotional energy of getting into the weeds on all of this stuff. So we are setting the number that we're setting in the plea agreement, and anything less than that you don't get to appeal. Everything Your Honor said is true of most plea agreements, maybe 98% of them. But this plea agreement was predicated on the government's view of loss, that there was a $96 million loss, $140 million loss. But it doesn't bind the court. It doesn't bind the court. So how is this different than any other plea agreement? They don't give the parties, typically would give the government and the defendants view of loss, right? Because whether or not the plea agreement was predicated on loss, that was a consequence of an exaggeration of the case in the first place, whether it was predicated on just the court's reassessment, it was wrong. This isn't a reassessment, a re-estimation of loss. It's not a mutual mistake. It's not a change in the law. The government imposed that 60-month waiver based on facts that they now disavow. When the government disavows its previously stated position on loss, the waiver falls with it. That's why this case, why this plea agreement is different from really maybe most 99% of the others. And this is on the background of motions I made before Judge Spat that the government exaggerated loss, failed timely to disclose exculpating financial data, from which Mazars concluded that neither defendant caused or intended and certainly caused any loss. Is your argument that it's not knowingly, it's not voluntarily, or it wasn't competently? I'm saying it's based on an error. The same way that the courts can throw out a criminal conviction. So you're saying that the government, after a plea is entered, decides that they're going to agree to a lower guideline range than was in the plea agreement. They lose the benefit of the waiver? No, this is not just concluding there's a lower guideline range. That would essentially be the holding, right? Wouldn't that be what you're asking us to hold? The government takes a position after the plea that lowers the defendant's sentence. They lose the benefit of the waiver. That's not this case. That's incorporated. It's part of this case, but it doesn't tell the whole story. The view of the defense in this case doesn't mean he can't get six months, doesn't mean he can't get over six months. But the view of the defense in this case is there was never any loss, that this case was woefully, I'm not sure that's the right word, horribly exaggerated from the get-go. And that's the motion practice we made to Judge Spat. They didn't come back and say we're re-estimating. They didn't come back and say, you know, we've changed this, we're slicing and dicing. They're coming back to saying what Manson said all along. There's no loss. There's no loss, and with regard to Manson, there's no gain. There was gain with regard to Callahan. That's why this plea agreement and this waiver is different. And that's why this court in other cases is saying we're not just going to look at the number, we're not just going to look at the fact of the plea agreement, we're going to look at what happened in the particular case. And what happened in this particular case is a challenge to the integrity of this case based on what Mazars concluded as well, corroborated was an exaggeration of loss, and a loss figure incorporated in the plea agreement which the government disavowed. Not just a lower estimate, not a re-estimate, but something that it disavowed. I'm sorry, so is your argument who didn't provide the notice, the government or the court? The court, because I said when I stood up at sentencing, the second day of sentencing, by the way, these were two lengthy proceedings before Judge Brown. How are we supposed to interpret the just so you know, I don't think this is enough. Why was that enough? Because of a couple of reasons. Number one, it happened at page 38 of the second day of sentencing, and he imposed sentence at 48, number one. Number two, it's after I said at page 13 that the 0 to 6, the government's agreement to 0 to 6, mooted all of the Judge Spaff had ruled on, because I got the benefit. The first proceeding, four months early, he asked for additional briefing. Briefing, correct. Because he was putting, I think, people on notice that he was concerned about the loss. He's the new judge on the case, and he's asking for questions. He wants to better understand it. Why wasn't there some notice about what was going to happen? It's not adequate notice, because you have to tell me before, if a judge is going to go above the guidelines on this kind of a ground, not a pure variance ground, but on loss, gain, you have to say before things start, or at least at a sufficient time, I'm considering an above-the-guideline range. And Judge Bianco, even at page 38 and 39, when he said, when he used the word warning, he didn't say he was thinking of going above the guidelines. And I've lived this case for nine years. He used the word variance numerous times. There is no indication that this was an upward departure in terms of the loss amount. I completely disagree with you on that. The most you can say, the worst you can— The only variance for which the Supreme Court has said no notice is required, period. The worst or most you can say, I'm not sure which applies here, is that what Judge Brown did straddles both worlds. It may be in the nature of a variance, but it also may be in the nature— At any point, at any time, did he ever say, I'm upward departing? It doesn't matter whether he uses the word variance or departure. It's based on what he said and what he was thinking. And Judge Bianco, he's talking about whether there was a loss, whether there was a gain, whether Manson could have reasonably foresaw what the government says Callahan did and whether his overpayment of millions of dollars was really an overpayment. And I want to make one other point. Before the second day of sentencing, and this is in my papers, I specifically asked his case manager, and I asked the probation officer, in light of the government's position of zero to six, do we need an addendum to the PSR? Do we need anything else? And Karen McMurrow, who I don't want to call out in front of Judge Brown, who I've dealt with for years, said it's zero to six. You don't have to worry about it. She may have been wrong. That doesn't bind Judge Brown. She may have been speaking out of school, but that's what was in my head. Among other things, when we get to page 38 and 48, Judge Brown allowed two investors, each of whom to speak twice at Manson's sentencing before we get to the page 38. And prior to even appearing for the first time before Judge Brown, there were multiple joint applications for content continuance, nine of which specifically said we need more time to see if we can resolve disputes to obviate the need of a fatical hearing. I see my time is up. Can I make one last practical point? It's been up for a while, but yeah, do wrap up. It has been up for a while. I appreciate it, Judge. Just one last point. I'll be very fast. There's a practical consideration here that I would ask the court to seriously consider, which is this. It's a 2013 indictment. It's a 2014 guilty plea, and sentencing didn't happen until October 2022. An additional year or so before Manson is required to surrender will help assure that all of the issues in this very complicated case are fully vetted. All right. Well, I mean, that's not really the standard, of course. You have to show that you have some prospect for winning. We'll come back. We'll hear from the government on this. This is Mr. Cafferon. Yes, Your Honor. Am I saying that right? Yes, Your Honor. All right. Good morning. May it please the court, my name is Chris Cafferon. I'm an assistant United States attorney for the Eastern District of New York. Defense counsel just said that the court's sentence straddled the guidelines. It did no such thing. As the court noted, nowhere in the sentencing court's proceeding did it say it had an indication that it was upwardly departing. It then followed up with a written statement of reasons making that clear. There's three sections that are applicable. We put it in our papers. Two of them specifically noted that it was a variance. The third one was where the court would have documented that it was an upward departure. It left that blank. It was crystal clear the court believed that the guidelines framework woefully understated the seriousness of the offense. As Your Honor noted, these were significant lies to auditors, significant lies to the bank. I think that's all clear. So I guess I'm curious, what is your response to Mr. Frisch's statement that the government disavowed its previously stated view of the law? Suggesting bad faith. The government has done everything in this case to give every benefit, took conservative approaches to both defendants in this case. They received credits that the guidelines framework didn't even envision. For example, there's case law that made it clear that when there is assets that are recovered after the indictment, those credits don't have to offset the losses. But the government gave him the, Mr. Callahan. It looked at the case and analyzed it and determined that Mr. Manson, who was presenting for sentencing, didn't have the same culpability that Mr. Callahan did. And the government treated Mr. Manson quite fairly. He had 13 different 20-year counts. I believe it was 13. But at least the highest count that he had was a 20-year count. It allowed him to plead to a 371, which was a five-year count. In addition, as the court noted, all these substantial benefits, including coverage for crimes that were not even charged in the indictment, including bank fraud, wire fraud, securities fraud, tax fraud that Mr. Callahan committed in exchange for that appellate waiver. He received substantial benefits throughout. He had very able counsel here in this case. Nowhere does he indicate that his prior retained counsel didn't advise him of the appellate waiver. In fact, if you look- It doesn't seem to be. It's a suggestion, I think, that the government sort of pulled a fast one by asserting different facts that was different from what they stipulated to in the agreement. That's what I just want to hear your response to. Right. There's no stipulation in the agreement as to what the position is. In fact, what we did was actually take a position that benefited the defendant that he has, from the time of his plea, his counsel had carved out the right to attack the guidelines. He didn't stipulate to the offense level. And he specifically, from Jump Street, believed this was a zero to six guidelines for Mr. Manson. He reserved that right and even noted during the plea hearing that he significantly disagreed with the government's position on loss. And so from our view, we tried to get it right. We tried to do what we believed was the correct result. And so we put in a very significant, lengthy memorandum explaining why we believed it wasn't reasonably foreseeable for Mr. Manson. And we gave him offsets for the panoramic view sale, which netted investors $2 million after repaying the bank loan. So we were giving him benefits throughout. And one thing, as I was preparing for the argument, I noticed in the sentencing transcript, there was a number of occasions where defense counsel lauded the government and its view in this case. At page 13, it described the AUSA as exceptionally and careful assistant in this case. On page 13, defense counsel noted that he used to work at the U.S. Attorney's Office, and then specifically said if this U.S. Attorney's Office reaches a decision on how a particular case should be treated, it is based on the merits and nothing else would come out of this office. Page 15, I respect and agree with the letter that the AUSA wrote to the court. Page 37, a very able and responsible prosecutor having thought this out for 10 years, I think he got it right. Page 46, here's what we know. And it's rare, I think, that the system works as well as it does to reach us to this point. And by us, I include the investors who got $2 million more. I include the government. Throughout this prosecution, the government has acted in good faith with respect to Mr. McCallaghan as well as Mr. Manson. And they have received tremendous benefits at sentencing, significantly reducing their guidelines range. The sentencing court's determination was based on a very thorough and careful analysis of the seriousness of the offense, imposed the sentence that it believed was required by a review of that 3553A factors after accounting for the mitigating circumstances that the defendant presented. And so for all those reasons, this court should deny the defendant's motion for bail because he doesn't raise a substantial question that his sentence was either procedurally or substantively unreasonable, as well as I believe this court will enforce that appellate waiver. All right. Thank you. We will reserve the seat. One last point. I appreciate that, Judge. I'll be 30 seconds. I've known Mr. Cafferone for 10 years. I used to work in their office. I've known Mr. James for 30 years. What I said about Mr. Cafferone was because he came to the zero to six range. And Judge Brown had a right to go above it, whether a departure or variance. All I'm saying is that based on the unusual, highly unusual history of this case, I was entitled to a hearing, which I would request if there's a remand, and I needed advance notice of what he was going to do to know that I needed to request one. And, Your Honor, I appreciate the extra time. All right. Okay. Thank you all. We'll now move on to our argument calendar for cases on appeal. The first is United States v. Kaufman. All right. Good morning, Mr. Boxer. Good morning, Your Honor. So you've got ten minutes, but you've reserved two minutes for rebuttal. I have. So that gives you eight minutes out of the gate. Let us just set the clock, and then we're ready to go. You may proceed. Thank you. May it please the court, counsel, good morning. The two gratuity convictions at issue in this case were the product of critical and serious errors and require reversal. With respect to count four, the one involving CBS radio, the jury asked a very specific, discreet note during its deliberations whether the mere acceptance of these strips by itself was enough to find Mr. Kaufman guilty of a gratuity. And instead of answering no, the court recharged on four of the elements, even though their note referenced only two, and did not charge the safe harbor provision, which we was basically the central feature of our defense to that count. These were not ordinary experiences in a typical bribery case. These were trips that were promoted by CBS radio, sanctioned by CBS radio. CBS radio executives were there. Executives from other big advertisers were there. Mr. Kaufman and his wife attended some of that. Right, but they're clearly against Melrose's own internal policies, right? Exactly. And so is that not relevant to whether something is in the ordinary course of business? It is relevant and admissible to his intent. But the safe harbor provision and what it provides and what they're required to disprove beyond a reasonable doubt about ordinary course of business, for this kind of trip with these people there, discussed openly, was central to the defense. And there was no request that the safe harbor provision be re-read to the jury when that note came out, right? That's correct. And let me say two things about that, Your Honor. First, I think it's plain error on this record, irrespective of whether it was preserved. I mean, what we're talking about here is the jury asking specifically. When have we ever found plain error during a jury note that the judge didn't read back some other portion of the charge that was not requested? I mean, I'd venture to say never. Well, there are some cases we cited where mistakes were made in subsequent jury instructions. There was no error in the instruction. The instruction was accurate. In fact, the judge did tell them no in response to the question because the district court said at the end, in any event, however, that the government proves that the defendant solicited or accepted a trip value of more than $1,000 and fails to prove beyond a reasonable doubt any one, two, or three of the other elements of the offense, then you must acquit. That's incorrect. That's an incorrect statement of the law because they still had to find beyond a reasonable doubt that the safe harbor didn't apply. But no, what that says is mere acceptance of $1,000 alone is not enough to convict. That's what that says. You have to find. Yeah, but he also. It's true. They also have to find the safe harbor. I agree with you on that. They have to find safe harbor doesn't apply. But certainly the judge did not suggest to them that accepting $1,000 is enough to convict. The judge said the exact opposite. So I don't think there's any error in anything the judge said. You just object to the fact that the district court pointed them to the other elements in addition to answering the question. No, right? I believe, and I don't have the record type for the page, but he told the jury. It's 1236. Okay, thank you. In the event the government proves beyond a reasonable doubt all four elements, you should convict. And that's an incorrect statement. And what we have here are these marketing trips and a risk of a policy violation.